# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-2100

_____

Charlene K. Wisbey,

       Appellant,

v.

City of Lincoln, Nebraska,

       Appellee.

      Appeal from the United States
District Court for the
District of Nebraska.

_____

Submitted: March 10, 2010
Filed:  July 6, 2010

_____

Before SMITH, BENTON, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

Charlene K. Wisbey appeals the district court's[1] dismissal on summary judgment of her lawsuit alleging violations of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213, and the Family Medical Leave Act (FMLA), 29 U.S.C. §§ 2601-2654.  For the reasons explained below, we affirm.

_____

[1]The Honorable David L. Piester, United States Magistrate Judge for the District of Nebraska, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

I.

As this appeal is from a grant of summary judgment, we review the facts in the light most favorable to the nonmoving party. See Reed v. City of St. Charles, 561 F.3d 788, 790 (8th Cir. 2009). Beginning in 1979, Wisbey worked as an "Emergency Dispatcher II" for the City of Lincoln, Nebraska ("the City"). The position required Wisbey to "receiv[e] calls for emergency service and dispatch[] emergency service units on a regular basis." (J.A. 25.) Because of the potentially life-saving aspect of her position, the City expected Wisbey to "function accurately while working under considerable pressure" and to "think and act quickly and calmly in emergency situations." (Id. at 26.) Prior to 2007, Wisbey was never disciplined for missing work or for any inability to perform the tasks of her position. In fact, her performance evaluations reflected positive remarks.

From January through February 2007, Wisbey utilized a significant amount of sick leave due to an upper respiratory infection. Wisbey was not compensated for this leave because she had previously exhausted her allotted sick leave. The City provided Wisbey a written warning for taking excessive leave and recommended that she apply for intermittent leave under the FMLA.[2] Wisbey complied with the request and on February 27, 2007, she applied for intermittent FMLA leave on the basis of depression and anxiety, claiming on the application that she had a "serious health condition that render[ed] [her] unable to perform the essential functions of [her] job." (Id. at 28.) Attached to the FMLA application, Wisbey submitted a medical certification from her physician, Dr. Pothuloori, stating that Wisbey "suffer[ed] from recurring cycle depression, anxiety [which] interferes with her sleep, energy level, motivation, [and] concentration . . . ." (Id. at 29.) Dr. Pothuloori's certification also indicated that, although Wisbey was "able to perform any one or more of the essential functions of

_____

[2]Wisbey had applied for, and received, FMLA leave on at least four prior occasions during her employment with the City.

[her] job," she would need to take time off work intermittently over the "next 6 months or longer." (Id.)   Dr. Pothuloori left the blank labeled "anticipated return to work date" empty.  (Id.)

Because the medical certification from Dr. Pothuloori indicated that Wisbey's concentration and motivation could be affected, Julie Righter, the Communications Manager of the City's emergency services, began to question whether Wisbey was still able to adequately perform her job as an emergency dispatcher.  Righter shared her concerns with Don Taute, the City's personnel director, who suggested further evaluation of Wisbey.  Righter asked William Kostner, a Risk Manager, to schedule an appointment for Wisbey to undergo a fitness-for-duty exam.

Kostner scheduled an appointment for Wisbey with Dr. Eli Chesen, a psychiatrist, requesting that Dr. Chesen perform a fitness-for-duty exam to determine, in his "professional medical opinion," if Wisbey was "qualified to continue her work" as an emergency dispatcher.[3]  (Id. at 20.)  To aid in his assessment, the City provided Dr. Chesen with information regarding the duties and job description of Wisbey's emergency dispatcher position.  Her position required that she possess the ability to "act quickly and calmly in emergency situations" and the "[a]bility to obtain accurate and complete information from callers who may be frantic and incoherent due to emergency conditions." (Id. at 26.)

During her appointment with Dr. Chesen, Wisbey described her lengthy battle with depression and insomnia and stated that the emergency nature of her job exacerbated those conditions.  For example, Wisbey described how she often

_____

[3]Wisbey maintains that the City inquired as to whether Dr. Chesen believed that Wisbey suffered from Posttraumatic Stress Disorder (PTSD), however, the record does not support this contention.  The only reference to PTSD in the record involves a statement in Dr. Chesen's report indicating that Wisbey "blames" her work issues on "alleged work-related Posttraumatic Stress Disorder." (J.A. 36.)

"witnessed" deadly events over the radio. After the examination, Dr. Chesen submitted a three-page report on his findings. The report stated that Wisbey suffered from "chronic relapsing depression (unipolar depression) which intermittently interferes with her ability to function at full capacity at work vis-á-vis tiredness" and that she was not "fit for duty as described in her job description, especially as related to tiredness, her ability to concentrate and her ongoing propensity to likely miss work." (Id. at 38.)

After receiving this report on March 28, 2007, the City expressed to Wisbey its concern that she could not perform her job, and placed Wisbey on administrative leave with pay. On the afternoon of May 30, 2007, Righter received an undated letter, authored by Dr. Pothuloori, which disagreed with Dr. Chesen's conclusion that Wisbey was unfit for duty. On May 31, 2007, Wisbey testified at a hearing before the City's Personnel Board that she stayed home from work when she felt tired, stating,

> [a]t times my depression arises, and it makes me very tired where I can sleep 20 straight hours. And that's where it interferes. Being tired at work was not ever a problem. But going on a string of six, seven straight days, I can get very tired due to the medication I'm on or due to the fact that I just get tired.

(Id. at 85-86.) Wisbey also stated that she would "never endanger anybody on the street by going [to work] tired or unprepared mentally." (Id. at 91.)

On April 3, 2007, the City met with Wisbey and provided her with a letter explaining that she was being terminated based on Dr. Chesen's determination that she was unfit for duty. The letter stated, "For your own safety it is important that you not continue in your present position." (Id. at 61.) The letter also encouraged Wisbey to "avail [herself] of City's long term disability benefits." (Id.) Wisbey filed suit in Nebraska state court, claiming that the City violated her rights under the ADA and the

-4-

FMLA. The City removed the case to federal court. Wisbey and the City filed cross motions for summary judgment.

The district court granted the City's motion for summary judgment and denied summary judgment to Wisbey, dismissing the case. As to Wisbey's ADA claim, the district court found that: (1) Wisbey failed to show that the City "perceived [her] as disabled as that term is defined under the ADA;" (2) no discriminatory evidence existed as to the City's decision to terminate Wisbey;" (3) Wisbey could not show that the City failed to reasonably accommodate her because her claim was premised on "a right to recovery solely on the basis of perceived disability;" and (4) even if the City was required to provide a reasonable accommodation, Wisbey failed to present any evidence of a feasible accommodation. (D. Ct. Order 22.) As for Wisbey's FMLA claim, the district court found that: (1) "in requesting indefinite, intermittent, self-determined leave," Wisbey did not show a right to leave protected by the FMLA; (2) Wisbey "failed to show that her employment termination was caused by the fact that she requested leave;" and (3) Wisbey was acceptably terminated based on medical information that she was unable to adequately perform her job and "not because she requested family medical leave." (Id. at 25-26.)

II.

On appeal, Wisbey argues that the district court erred in granting summary judgment to the City, because the requirement that she submit to a fitness-for-duty exam "was a violation of the ADA and the FMLA and that there is, at a minimum, a question of fact [as to] whether [she] could perform the essential functions of her job, but was terminated due to [the City's] perception of her as disabled." (Appellant's Br. 9.) "Summary judgment is proper if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law." Thomas v. Union Pac. R.R., 308 F.3d 891, 893 (8th Cir. 2002). However, summary judgment should be used

"sparingly" in employment discrimination cases. <u>Arnold v. Nursing & Rehab. Ctr. at Good Shepherd</u>, 471 F.3d 843, 845-46 (8th Cir. 2006). Indeed, we are particularly deferential to the nonmovant in employment discrimination cases because the cases often lack direct evidence and are decided on mere inferences. <u>See</u> <u>Land v. Washington County</u>, 243 F.3d 1093, 1095 (8th Cir. 2001). Notwithstanding this point, summary judgment is proper here because Wisbey has failed to establish a factual dispute regarding any essential element of her case. <u>See</u> <u>Arnold</u>, 471 F.3d at 846.[4]

## A. ADA

From Wisbey's convoluted argument,[5] we gather she challenges the district court's finding that no ADA violation occurred, insisting that genuine issues of material fact exist as to whether: (1) the City regarded her as disabled; (2) she could perform the essential functions of her job; and (3) the City failed to provide her a reasonable accommodation. We are unpersuaded by Wisbey's attempt to improperly stretch well-established ADA principles.

The purpose of the ADA is to eliminate discrimination against qualified employees with disabilities. 42 U.S.C. § 12101. As the employee, Wisbey bears the

---

[4]We recently discussed in detail the use of the summary judgment standard in employment discrimination and retaliation cases. <u>See</u> <u>Torgerson v. City of Rochester</u>, No. 09-1131, 2010 WL 2010996, at *7 (8th Cir. May 21, 2010) (<u>citing</u> cases).

[5]The City argues that Wisbey did not assign error in her opening brief as to her ADA claim and that she has waived the issue. <u>See</u> Fed. R. App. P. 28(a)(9)(A) (requiring an appellant's brief to contain the "contentions and the reasons for them, with citations to the authorities, and parts of the record on which the appellant relies."); <u>see also</u> <u>United States v. Gonzales</u>, 90 F.3d 1363, 1369-70 (8th Cir. 1996) (failure to assign error in a brief is considered abandonment of the issue). Although we find her argument somewhat disorganized, we conclude that Wisbey has sufficiently raised the issue for our consideration.

initial burden of establishing a prima facie case of discrimination under the ADA. Kosmicki v. Burlington N. & Santa Fe Ry., 545 F.3d 649, 651 (8th Cir. 2008). To do so, Wisbey must demonstrate that she: (1)"was disabled within the meaning of the ADA;" (2) "was qualified to perform the essential functions of [her] job;" and (3) "suffered an adverse employment action because of [her] disability." Id. As Wisbey has not shown that she was a disabled person within the meaning of the ADA, we refrain from discussing the other elements.

The ADA defines a disability, with respect to an individual, as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2). A "major life activity" means "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I). In her complaint, Wisbey concedes that she "does not have a disability or a substantially limiting impairment." (J.A. 6, ¶ 9.) However, Wisbey brings her ADA claim under the "regarded as" provision, arguing that she was "perceived by [the City] as having an impairment which substantially limits one or more major life activities" and that "[t]his perception caused [the City] to discharge [her]." (Id. at 7, ¶ 19.)

"In order to be regarded as disabled with respect to the major life activity of working, the employer must mistakenly believe that [an] *actual impairment* substantially limits the employee's ability to work." Chalfant v. Titan Distribution, Inc., 475 F.3d 982, 989 (8th Cir. 2007) (emphasis added). A substantial limitation on the major life activity of working means that an individual must be:

> significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(I).

Under the ADA, the "regarded as" provision was established to combat "archaic attitudes, erroneous perceptions, and myths" working to the disadvantage of the disabled or perceived disabled. Brunko v. Mercy Hosp., 260 F.3d 939, 942 (8th Cir. 2001) (quotations omitted). "If a restriction is based upon the recommendations of physicians, then it is not based upon myths or stereotypes about the disabled and does not establish a perception of disability." Breitkreutz v. Cambrex Charles City, Inc., 450 F.3d 780, 784 (8th Cir. 2006).

The record establishes that Wisbey was terminated because she was not "fit for duty," as reported by Dr. Chesen,[6] and not based on any myths or stereotypes about being disabled. See Brunko, 260 F.3d at 942 . In fact, Wisbey herself even admitted in her FMLA application that she was suffering a "serious health condition that render[ed] [her] unable to perform the essential functions of [her] job," (J.A. at 28), and she testified at the hearing before the City's Personnel Board that she did not go to work when she felt tired due to her depression. Therefore both Wisbey and her own doctor, determined that she would have to take leave on sporadic occasions based on her condition, providing support that the City did not mistakenly regard Wisbey as

_____

[6]Wisbey also argues that the difference of opinion between Dr. Chesen and Dr. Pothuloori as to whether Wisbey was fit for duty creates a genuine issue of material fact. However, Wisbey did not in anyway dispute the contents of the fitness-for-duty report until the night before the Personnel Board hearing—weeks after the fitness-for-duty report was completed. The record reflects that, upon receipt of the undated letter disputing Dr. Chesen's findings, the City had already decided to terminate Wisbey because she was unfit for duty. We have held that a contrary medical report that is provided after a decision to terminate is irrelevant. See Kozisek v. County of Seward, 539 F.3d 930, 935 (8th Cir. 2008) ("That Kozisek was able, two months later, to manipulate a physician from the VA into providing a letter opining that outpatient treatment would be sufficient does not matter.").

having an impairment that substantially limited her ability to work, but that Wisbey was, in fact, unable to work due to her condition.

Wisbey further alleges that the fitness-for-duty exam did not constitute a business necessity because it required her to submit to an exam that is not permitted under the ADA. The ADA prohibits an employer from requiring a medical examination or inquiring into the disability status of an employee "unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A). "To demonstrate compliance with § 12112(d)(4)(A), the employer bears the burden to show the asserted 'business necessity' is vital to the business and the request for a medical examination or inquiry is no broader or more intrusive than necessary." Thomas v. Corwin, 483 F.3d 516, 527 (8th Cir. 2007).

Moreover, employers are permitted "to use reasonable means to ascertain the cause of troubling behavior without exposing themselves to ADA claims," Cody v. CIGNA Healthcare of St. Louis, Inc., 139 F.3d 595, 599 (8th Cir. 1998), and fitness-for-duty exams are considered a reasonable means of making this determination, see Thomas, 483 F.3d at 528. In Thomas, we held that a fitness-for-duty exam was appropriate where a company "sought to ascertain whether [the employee] was fit to return to a position under the same working conditions that allegedly caused [her] stress and anxiety . . . [and] an extended three-week absence from work." Id. As here, the employer in Thomas directed the examining doctor "to determine whether any psychological problems interfered with [the employee's] ability to return to work." Id. We noted:

> "Courts will readily find a business necessity if an employer can demonstrate . . . a medical examination or inquiry is necessary to determine . . . whether the employee can perform job-related duties when the employer can identify legitimate, non-discriminatory reasons to doubt the employee's capacity to perform his or her duties (such as

-9-

frequent absences . . .),” or “whether an employee’s absence or request for an absence is due to legitimate medical reasons, when the employer has reason to suspect abuse of an attendance policy.”

Id. at 527 (quoting Conroy v. N.Y. State Dep’t of Corr. Servs., 333 F.3d 88, 97-98 (2d Cir. 2003)).  In an analogous case, Gajda v. Manhattan & Bronx Surface Transit Operating Auth., 396 F.3d 187 (2d Cir. 2005) (per curiam), the Second Circuit held that an employee’s statements on an FMLA application, which noted, “[m]y own serious health condition renders me unable to perform the functions of my position,” and statements from the employee’s doctor that “[the employee] will need intermittent leave at undetermined times for lifetime,” id. at 189, provided the employer “‘legitimate, non-discriminatory reasons to doubt the employee’s capacity to perform his . . . duties.’”  Id. (quoting Conroy, 333 F.3d at 98).

The nature of Wisbey’s position supports the City’s claim that the fitness-for-duty exam was a business necessity.  As a dispatcher, Wisbey played an essential role in emergency functions and her position required her to be present to answer calls and alert at all times.  In this position, people’s lives are often at risk and a dispatcher’s ability to focus and concentrate at all times is essential to adequate job performance.  See, e.g., Krocka v. City of Chicago, 203 F.3d 507, 515 (7th Cir. 2000) (“It was entirely reasonable, and even responsible,” for a city to require a fitness-for-duty exam for a police officer when the city learned that “he was experiencing difficulties with his mental health”); Watson v. City of Miami Beach, 177 F.3d 932, 935 (11th Cir. 1999) (holding that a fitness-for-duty exam of a police officer that exhibited abnormal mental conditions was acceptable and that the city was not “required to forgo a fitness for duty examination to wait until a perceived threat becomes real or questionable behavior results in injuries”).  As the Seventh Circuit has noted:

where inquiries into the psychiatric health of an employee are job related and reflect a concern with the safety of employees, the employer may, depending on the circumstances of the particular case, require specific

-10-

medical information from the employee and may require that the employee undergo a physical examination designed to determine his ability to work.

Krocka, 203 F.3d at 515 (quotations and alterations omitted).

Although Wisbey relies on Albert v. Runyon, 6 F. Supp. 2d 57 (D. Mass. 1998), in support of her proposition that the fitness-for-duty exam violated the ADA, Albert actually supports the City's position. Unlike Wisbey, the claimant in Albert "deni[ed] that the ADA . . . [was] implicated . . . since she [was] not . . . under any disability and [was] not making any claim under the ADA." Id. at 62. Furthermore, the court noted that "an employer may have sufficient business justification to require an employee returning from FMLA leave to undergo examination only if she suffers from a continuing disability that the employer has reason to believe might affect her job performance." Id. at 69.

Here, the implication in the FMLA application that Wisbey suffered from conditions affecting her concentration and motivation reasonably gave the City pause with respect to whether Wisbey could continue as an emergency dispatcher. The fitness-for-duty exam provided the City with a legitimate means of resolving the matter by allowing the City "to ascertain whether [Wisbey] was fit to return to a position under the same working conditions that allegedly caused [her illnesses]." Thomas, 483 F.3d at 528. Accordingly, we conclude that the City did not violate the ADA by requiring Wisbey to obtain a fitness-for-duty exam.

## B. FMLA

Although we find Wisbey's FMLA argument unorganized, she appears to assert that the fitness-for-duty exam was unwarranted under the FMLA because the City had

previously accepted Dr. Pothuloori's certification,[7] as submitted in Wisbey's FMLA application, that she could "perform any one of more of the essential functions of [her] job," although she would need to take time off work intermittently. (J.A. 29.) "Two types of claims exist under the FMLA: (1) 'interference' . . . claims, in which the employee alleges that an employer denied or interfered with his substantive rights under the FMLA and (2) 'retaliation' . . . claims, in which the employee alleges that the employer discriminated against him for exercising his FMLA rights." Stallings v. Hussmann Corp., 447 F.3d 1041, 1050 (8th Cir. 2006) (citing 29 U.S.C. § 2615(a)(1)-(2)). "The difference between the two claims is that the interference claim merely requires proof that the employer denied the employee his entitlements under the FMLA, while the retaliation claim requires proof of retaliatory intent." Id. at 1051. As the City notes in its brief, it is unclear which type of FMLA claim Wisbey raises. Regardless, we find summary judgment proper as to both types of claims.

### 1. Interference

An employer is prohibited from interfering with, restraining, or denying an employee's exercise of or attempted exercised of any FMLA right. 29 U.S.C. § 2615(a)(1). Interference includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave. It would also include manipulation by a covered employer to avoid responsibilities under FMLA." 29 C.F.R. § 825.220(b). "In an interference claim, an employee must show only that he or she was entitled to the benefit denied." Stallings, 447 F.3d at 1050 (quotation omitted). In Stallings, we held that a retaliation claim, and not a interference claim, existed when the employer "granted every request [the employee] made to take FMLA leave," and the employee had failed to establish that the employer had "denied him a benefit to which he was entitled because he received all of the FMLA leave he requested." Id.

---

[7]Under the FMLA, "An employer may require that a request for leave . . . be supported by a certification issued by the health care provider of the eligible employee. . . ." 29 U.S.C. § 2613(a).

at 1051. Similarly here, Wisbey was never denied FMLA leave and, therefore, has not shown that she was entitled to any benefit that was denied. See id. at 1050-51.

Furthermore, contrary to Wisbey's claim, "the FMLA does not provide leave for leave's sake, but instead provides leave with an expectation an employee will return to work after the leave ends." Throneberry v. McGehee Desha County Hosp., 403 F.3d 972, 978 (8th Cir. 2005). Even had Wisbey's FMLA requests been denied,

> the FMLA does not provide an employee suffering from depression with a right to unscheduled and unpredictable, but cumulatively substantial, absences or a right to take unscheduled leave at a moment's notice for the rest of her career. On the contrary, such a situation implies that she is not qualified for a position where reliable attendance is a bona fide requirement . . . .

Spangler v. Fed. Home Loan Bank of Des Moines, 278 F.3d 847, 853 (8th Cir. 2002) (quotation omitted). Therefore, because Wisbey requested "intermittent leave" for "six months or longer" she did not have a right to FMLA leave. Without the right to FMLA leave, the City could not have interfered with Wisbey's rights under the FMLA.

## 2. Retaliation

An FMLA retaliation claim alleges that an employer discriminated against an employee for asserting his rights under the act. See Darby v. Bratch, 287 F.3d 673, 679 (8th Cir. 2002) (citing 29 U.S.C. § 2615(a)(2)). "Basing an adverse employment action on an employee's use of [FMLA] leave . . . is therefore actionable." Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832 (8th Cir. 2002). To establish a retaliation claim, Wisbey must show: (1) "that she exercised rights afforded by the Act;" (2) "that she suffered an adverse employment action;" and (3) "that there was a causal connection between her exercise of rights and the adverse employment action." Id.

Wisbey did not establish a causal connection between her application for FMLA leave and her termination because the City relied on the fitness-for-duty exam, and not Wisbey's FMLA application, in its determination to terminate Wisbey's employment. The kind of causal connection required for a prima facie case is not "but for" causation, but rather a showing that an employer's "'retaliatory motive played a part in the adverse employment action,'" Kipp v. Missouri Highway and Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) (quoting Sumner v. United States Postal Serv., 899 F.2d 203, 208-09 (2d Cir. 1990)). Here, the City lacked such a retaliatory motive. Furthermore, Wisbey has not presented any evidence of retaliation besides the fact that her termination occurred approximately one month after she submitted the FMLA application. "Generally, more than a temporal connection . . . is required to present a genuine factual issue on retaliation," and "mere coincidence of timing can rarely be sufficient to establish a submissible case of retaliatory discharge." Id. (quotations omitted). Therefore, we conclude that the City did not retaliate against Wisbey in violation of the FMLA.

## IV.

Accordingly, we affirm the district court's judgment.

_____