PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

RAYMOND PORTER,
Plaintiff-Appellant,

v.

No. 96-1441

UNITED STATES ALUMOWELD
COMPANY, INCORPORATED,
Defendant-Appellee.

Appeal from the United States District Court
for the District of South Carolina, at Spartanburg.
Henry M. Herlong, Jr., District Judge.
(CA-95-675-20AK-7)

Argued: December 2, 1996

Decided: September 15, 1997

Before WILKINSON, Chief Judge, ERVIN, Circuit Judge, and
DAVIS, United States District Judge for the
District of Maryland, sitting by designation.

_____

Affirmed by published opinion. Judge Ervin wrote the opinion, in
which Chief Judge Wilkinson and Judge Davis joined.

_____

COUNSEL

ARGUED: Edwin Lake Turnage, Travelers Rest, South Carolina, for
Appellant. Jack Harding Tedards, Jr., LEATHERWOOD, WALKER,
TOOD & MANN, P.C., Greenville, South Carolina, for Appellee.

_____

**OPINION**

ERVIN, Circuit Judge:

Raymond Porter brought this action alleging that his termination by United States Alumoweld Company, Inc. (Alumoweld) violated the Americans with Disabilities Act (ADA), 42 U.S.C.§ 12101 et seq.; the Family and Medical Leave Act (FMLA), 29 U.S.C.§ 2601 et seq.; and South Carolina Code Ann. § 41-1-80 (1976), prohibiting retaliatory discharge based on the filing of workers' compensation claims. Subsequent to the case being referred to a magistrate judge, the district court denied Porter's motion for summary judgment and granted Alumoweld's motion for summary judgment. For the reasons hereinafter explored, we affirm.

I.

Summary judgment should be entered if there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. This Court reviews the district court's grant of summary judgment de novo, drawing reasonable inferences and taking all evidence in the light most favorable to Porter. Roe v. Doe, 28 F.3d 404, 406-07 (4th Cir. 1994).

II.

Porter was employed by Alumoweld as a BD machine operator from August 6, 1991, until May 10, 1994. According to Porter, a BD machine operator occasionally lifts and replaces dies weighing up to 15 pounds and picks up stems of wire weighing up to approximately 42 pounds two or three time per shift. Additionally, the operator must occasionally pull metal wire, thread the machine, and roll a heavy reel of wire.

Porter and Alumoweld stipulated to Porter's history of back injuries and supporting medical records. In September 1992, Porter injured his back, sustaining a ruptured disc. On October 11, 1993, he again injured his back at work. He filed a workers' compensation claim on October 25, 1993. Alumoweld and its carrier did not pay

2

him workers' compensation benefits during his absence from work. Porter was then placed on a personal leave of absence from November 8-18, 1993. The company again put him on a leave of absence effective February 14, 1994. Alumoweld's February 14 letter included the following statement: "In order to return to an active status you will have to provide sufficient documentation from all doctors and/or physical therapists seen during this time clearly stating your sustained physical ability to perform the functions necessary for your position held at U.S. Alumoweld Company, Inc."

Porter underwent surgery on April 7, 1994. The operation was performed by Dr. Marcelino I. Chavez, who wrote a note dated May 9, 1994, stating only: "This is to advise you that I saw the above patient on April 29, 1994. At that time he was doing well. I feel that Mr. Porter is able to return to work safely without any limitations." Alumoweld responded to Dr. Chavez that it needed more information in the form of a functional capacity evaluation to determine whether Porter would be physically able to return to work. Chavez's office called the company to advise that the doctor did not perform that test and an appointment would have to be made elsewhere. Alumoweld informed Porter that he would be responsible for paying for the evaluation. Porter never underwent the medical evaluation.

On June 8, 1994, Porter received a letter informing him that he was fired, "freeing him up to explore new opportunities." The company contends that he was fired because he did not undergo the functional capacities examination.

III.

A.

Porter claims that Alumoweld violated Title I of the ADA which prohibits discriminatory discharge of "a qualified individual with a disability because of the disability." 42 U.S.C.§ 12112(a). We find, rather, that the ADA allowed Alumoweld to request a medical examination from Porter and, therefore, the company's decision to terminate him did not violate the ADA.

3

The ADA provides that an employer is prohibited from requiring a medical examination or making inquiries of an employee as to whether he is an "individual with a disability or as to the nature or severity of the disability unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4). To determine whether a medical examination meets these requirements, the Equal Employment Opportunity Commission (EEOC) regulations provide clarification. "This provision permits employers to make inquiries or require medical examinations (fitness for duty exams) when there is a need to determine whether an employee is still able to perform the essential functions of his or her job." 29 C.F.R. Part 1630, App. § 1630.14(c).[1] Further, Section 9.4 of the EEOC Technical Assistance Manual on the Employment Provisions of the ADA provides the following: "If a worker has an on-the-job injury which appears to affect his/her ability to do essential job functions, a medical examination or inquiry is job-related and consistent with business necessity."

Administrative interpretations of the ADA by the enforcing agency (here, the EEOC), "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." Meritor Sav. Bank v. Vinson, 477 U.S. 57, 65 (1986). According to the EEOC, an employer's request for a fitness for duty exam after an on-the-job injury is clearly job-related and a business necessity under § 12112(d)(4) of the Code, and we agree with the EEOC's assessment. We conclude that the exam in this case meets this standard. Further, the facts that Porter's job required lifting and pulling, and that he had encountered problems carrying out his job due to back problems even before the surgery, indicate that the requested fitness for duty exam was indeed job-related and necessary to determine if he could carry out his duties.

_____

[1] Porter argues that the additional language of Section 1630.14(c) requires that the medical examinations be "required by medical standards or requirements established by Federal, State, or local law . . . ." Porter ignores the plain language of the regulation which states, after the language allowing for fitness for duty exams, that"[t]his provision also permits periodic physicals . . . required by medical standards or requirements established by Federal, State, or local law . . . ." (emphasis added).

4

The reasoning of several of our sister circuits is consistent with our endorsement of the plain language of the EEOC regulations. See Grenier v. Cyanimid Plastics, Inc., 70 F.3d 667, 676 (1st Cir. 1995) (finding that if the plaintiff were "treated as an existing employee returning from disability leave, . . . the employer would be able to demand medical certification of ability to return to work"); Hogan v. Bangor and Aroostook R.R. Co., 61 F.3d 1034, 1036 (1st Cir. 1995) (concluding that an employee was entitled to reinstatement after suffering collapsed lung as soon as medical evidence indicated he was fit to return); Pesterfield v. Tennessee Valley Auth., 941 F.2d 437, 438 (6th Cir. 1991) (holding that an employee who was hospitalized for psychiatric treatment was required to provide medical certification as to ability to return to work). We concur in the reasoning of these circuits.

Two additional aspects of ADA analysis require a brief mention. First, we note that, by not consenting to a functional capacity evaluation, Porter was unable to prove disability, the first step required for a showing of discriminatory discharge under the ADA. To prove a violation of the ADA, Porter must establish that 1) he was disabled, 2) that he was otherwise qualified for his position and 3) that he was fired solely on the basis of disability. 42 U.S.C.A.§ 12112; Doe v. Univ. of Maryland Med. Sys. Corp., 50 F.3d 1261, 1264-65 (4th Cir. 1995); Tyndall v. National Educ. Ctrs., 31 F.3d 209, 212 (4th Cir. 1994). Porter offers no other evidence of disability.[2]

Second, we quickly address Porter's contention that Alumoweld "should have analyzed whether Porter could be accommodated and whether he could perform the essential functions of his job before demanding the medical examination."[3]  Since Porter did not undergo

_____

[2] Oddly, Porter actually claims that he is not disabled while simultaneously attempting to prove an ADA violation.

[3] To determine whether a person is qualified under the second prong, a court must conduct the following analysis:

> First, we must determine whether the individual could perform the essential functions of the job, i.e., functions that bear more than a marginal relationship to the job at issue. Second, if (but only if) we conclude that the individual is not able to perform the

5

the requested medical examination and offered no other evidence, he failed in his initial showing of disability, as noted above. The court below therefore need not have examined whether Porter was "otherwise qualified," the second prong of the discriminatory discharge test.

Alumoweld's request for a fitness for duty exam was job related and consistent with business necessity and, thus, comports with the requirements of the ADA. Further, by refusing to undergo the exam, Porter precluded the disclosure of information necessary to an evaluation of discriminatory discharge under the ADA.

B.

Porter next asserts that Alumoweld violated the FMLA by requiring him to undergo the fitness for duty exam. Porter cites the governing regulations which state that a "fitness-for-duty certification" under the FMLA "need only be a simple statement of an employee's ability to return to work," 29 C.F.R. § 825.310(c), and says that Alumoweld had no grounds to ask for more. Porter fails to recognize that the FMLA certification is a health verification distinct from the ADA-prescribed exam. In fact, the FMLA implies that an employee may be required to meet the fitness requirements of that Act and the ADA: "Similarly, the requirements under the Americans with Disabilities Act (ADA) that any return-to-work physical be job-related must be complied with." Id.

Under Porter's reading of the FMLA, that Act would be violated every time an employer requested a fitness for duty exam under the ADA, a request which requires the disclosure of more medical infor-

_____

> essential functions of the job, we must determine whether any reasonable accommodation by the employer would enable him to perform those functions.

White v. York Int'l. Corp., 45 F.3d 357, 361-62 (10th Cir. 1995) (quoting Chandler v. City of Dallas, 2 F.3d 1385, 1393-94 (5th Cir. 1993), cert. denied, ___ U.S. #6D6D 6D#, 114 S.Ct. 1386 (1994)); see also School Bd. of Nassau County v. Arline, 480 U.S. 273, 287 n. 17 (1987); Gilbert v. Frank, 949 F.2d 637, 640-42 (2d Cir. 1991); Chari v. City of League City, 920 F.2d 311, 318 (5th Cir. 1991).

6

mation than would be available from the FMLA's "simple statement of an employee's ability to return to work." We reject Porter's attempt to so restrict the operation of the ADA.**4**

C.

Although Porter does not cite the applicable statute, he apparently alleges that Alumoweld violated the South Carolina"Prohibition against retaliation based upon employee's institution of, or participation in, proceedings under Workers' Compensation Law; civil actions." S.C.Code Ann. § 41-1-80. The district court properly relied on the determinative factor test under South Carolina law "which requires the employee to establish that he would not have been discharged `but for' the filing of the claim." Wallace v. Milliken & Co., 406 S.E.2d 358, 360 (1991).

Porter's only evidence that he was fired due to his workers' compensation claim is his own affidavit stating that Alumoweld told him the company's workers' compensation carrier had required the fitness for duty examination. Alumoweld denies that its employee made this statement. Regardless, this factual dispute only refers to who made the recommendation for the examination, and does not contradict the finding of the magistrate judge that "the plaintiff was discharged for failing to take the examination, not for filing a claim." Thus, even when viewing the facts in the light most favorable to Porter, there is no genuine issue of material fact about whether Porter would have been fired but for his filing the claim.

The South Carolina Supreme Court, in addition to establishing a but-for causation test to govern these cases, has determined that the

_____

**4** Alumoweld contends that Porter waived his right to appeal the issue of the alleged FMLA violation when he failed to include this issue in his objections to the magistrate judge's Report and Recommendation. Because the FMLA claim is without merit, we neither address the question of whether Porter waived his right to appeal the claim by not objecting to the magistrate judge's report nor, in the alternative, whether he was excused for not objecting due to insufficient notice by the magistrate judge of the mandatory nature of filing objections and the consequences of failing to file them under Fed. R. Civ. P. 72.

plaintiff must provide evidence sufficient to support the conclusion that the employer's proffered reason for discharging the employee was pretext for retaliation. The South Carolina Supreme Court has adopted the following analysis:

> The burden of persuasion never shifts and the employee bears the burden of persuasion that the reason given for termination was pretextual. . . . The employee may succeed in this, either directly by persuading the court that the discharge was significantly motivated by retaliation for [his] exercise of statutory rights, or indirectly by showing that the employer's proffered explanation is unworthy of credence.

Wallace, 406 S.E.2d at 360 (quoting Buckner v. General Motors Corp., 760 P.2d 803, 807 (Okla. 1988)).

Porter's argument that Alumoweld's claimed reason for firing him was pretextual is not supported by the record. Porter alleges that "[a]t some point around late October or early November 1993, very shortly after Porter filed a workers' compensation claim, Alumoweld fired [him]." Contrary to this claim, Alumoweld's November 10, 1993 letter to Porter noted that his employment had, in fact, not been terminated as of that date.[5] Despite continued extended absences, Porter was not fired at this point. Further, the parties stipulate that Porter had sustained multiple injuries and filed numerous claims with Alumoweld's Workers' Compensation carrier between 1991, when he was hired, and his termination; these previous filings had not resulted in Porter being fired. Finally, Alumoweld's February 11, 1994, letter to Porter did not foreclose the possibility of his returning to work; rather, the letter placed him on "indefinite leave of absence" and stated that he could not return to work before obtaining "documentation from all doctors and/or physical therapists seen during this time clearly stating your sustained physical ability to perform functions necessary for your position . . . ." Porter was not terminated until June 6, 1994.

_____

[5] Alumoweld's letter stated in somewhat obscure language that Porter was "not voluntarily quit (three days no word of notice) however, you have been placed on personal leave of absence until November 19, 1993." (emphasis in original).

8

The record reveals that Alumoweld did not terminate Porter for his numerous workers' compensation filings during his employment and that the company only required documentation of his fitness for duty after his October 11, 1993, back injury. Porter's April 7, 1994, surgery made the need to determine his fitness for duty even more legitimate. Additional evidence that the request for a functional capacity exam was not pretextual is that the operating doctor (Dr. Chavez) was not familiar with Porter's exact job duties, Dr. Chavez's memorandum of Porter's fitness for work was extremely cursory, and two doctors consulted by Alumoweld recommended a functional capacity exam after the surgery.

There is almost no evidence to contradict a finding that, because Porter would not undergo the tests necessary to establish his fitness to resume his duties, he was fired. No reasonable jury could find that Porter's filing his workers' compensation claims was the determinative factor in his dismissal; nor could such a jury find that Alumoweld's reason for firing Porter was pretextual, based solely on Porter's suspicions about the timing of the November 10, 1993, letter requiring documentation of fitness and his claim that Alumoweld's workers' compensation carrier was the source of this requirement.

IV.

Because Alumoweld's request for a fitness for duty examination from Porter was job-related and consistent with business necessity, the request did not violate the ADA. Also, because Porter's refusal to submit to this exam precluded a determination of his disability, he was unable to prove discriminatory discharge under the ADA. Further, the FMLA is not implicated and the record does not support Porter's claim of retaliatory discharge under South Carolina law for filing a workers' compensation claim. Accordingly, the district court's judgment is

AFFIRMED.

9